NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

BYRON H., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, A.H., *Appellees.*

No. 1 CA-JV 21-0243
FILED 1-13-2022

---

Appeal from the Superior Court in Maricopa County
Nos.  JS20691
JD40104
The Honorable Todd F. Lang, Judge

**AFFIRMED**

---

COUNSEL

Denise L. Carroll Esq., Scottsdale
By Denise L. Carroll
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Dawn R. Williams
*Counsel for Appellee, Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge Maria Elena Cruz and Judge Samuel A. Thumma joined.

---

**B R O W N**, Judge:

¶1   Byron H. ("Father") appeals the juvenile court's order terminating his parental rights to his son, A.H., born in August 2020. For the following reasons, we affirm.

## BACKGROUND

¶2   Father and Sierra A. ("Mother") are A.H.'s biological parents. On the night of October 5, 2020, Mother went to work and Father cared for the child. The next morning, A.H. was admitted to a hospital after Mother came home from work and found him almost nonresponsive, with a bruise on his right eye and a small laceration on the top of his head. Father told Mother he accidentally dropped a shampoo bottle on A.H.'s face while giving him a bath, and he "might have squeezed [A.H.]" when they were sleeping in the same bed.

¶3   Testing revealed that A.H. had two skull fractures and acute subdural hemorrhages. A subsequent skeletal survey showed that A.H. had two healing rib fractures, a healing left tibia metaphyseal fracture, and a healing left humeral metaphyseal fracture. Doctors identified swelling and bruising of both eyes, bruising of the scalp with an abrasion, bruising of the abdomen, and a healing abrasion on the inner upper lip. These injuries were deemed to be "non-accidental trauma-based injuries."

¶4   On the same day of A.H.'s hospital admission, the Department of Child Safety ("DCS") and the Phoenix Police Department spoke with both parents about the injuries, and the parents reported that they were A.H.'s only caregivers. Both parents then completed drug tests, and as relevant here, Father tested positive for amphetamine, methamphetamine, cocaine, benzoylecgonine, m-hydroxycocaine, and THC metabolite. Both parents later admitted they had used methamphetamines while taking care of A.H.

¶5   Ten days later, A.H. was discharged from the hospital and placed with his maternal grandmother. DCS then filed a dependency

petition as to both parents. As to Father, DCS alleged that he was "unwilling or unable to provide the child with proper and effective parental care due to physical abuse" or "failing to protect" the child from abuse. DCS further alleged that Father was unable to provide proper care due to substance abuse, noting "he would smoke methamphetamines outside the home, but then would be responsible for caring for his infant son while under the influence."

¶6 During a November 2020 hearing, the juvenile court ordered that both parents receive services, including a parent aide, substance abuse assessment and treatment, substance abuse testing, and transportation as needed. DCS petitioned for termination of Mother's and Father's parental rights shortly thereafter. DCS alleged in part that "Father has willfully abused" A.H. or "failed to protect" him from willful abuse under A.R.S. § 8-533(B)(2). It further alleged that continuing "the parent-child relationship would be detrimental" to A.H. because it would leave him in care for an indeterminate period given that he "does not have parents who are able to care for him free from physical abuse."

¶7 In a March 2021 report to the juvenile court, DCS explained in part that Father was resistant to services provided by TERROS and that he had tested positive for methamphetamine and THC for the majority of his random drug tests. DCS further expressed concern that "he is still resistant to accepting assistance with changing his behaviors." Also in March 2021, the juvenile court found A.H. dependent as to both parents after accepting their no contest pleas. The court ordered that DCS expedite Father's parent aide referral, as he had not received that service.

¶8 The court then held a termination hearing over a period of four days in April 2021. Father testified that he accidentally dropped the shampoo bottle on the child, and it landed on his right eye. Father surmised that A.H. received the fractures that day from Father rolling over and squeezing A.H. while sleeping, in addition to dropping the bottle on his head. Father could not explain how A.H. received rib fractures. Father testified that he tested positive for methamphetamine because he had smoked from a "cart pen" that had methamphetamine residue and from one time that he found and smoked a cigarette in his apartment complex that tasted like methamphetamine. The court also heard testimony from medical experts who opined that Father's explanation did not account for all of A.H.'s injuries, that the pattern of injuries was consistent with abuse, and that A.H. did not suffer from any abnormality that would account for his bruising or fractures, such as issues with bone fragility, blood clotting, or a bleeding disorder.

¶9        Addressing safety concerns, DCS case manager Valerie Padilla testified that Father had not acknowledged his substance abuse issue, and that continued substance abuse would impact his ability to parent. She also explained DCS's concerns about Father's physical abuse of A.H., and the "multiple stories" Father offered as to how A.H. was seriously injured.   As to services, Padilla explained on cross-examination that although the juvenile court ordered DCS to "put in a referral for a parent aide," the referral was not made because Father tested positive for methamphetamine shortly after the court's order and services are "not a component" of the "physical abuse ground."

¶10       In its termination ruling, the juvenile court addressed the services DCS offered to both parents.  The court noted in part that Father was provided with substance abuse treatment and counseling services, but that he had not completed that treatment and continued to use methamphetamine throughout the proceedings.  The court found that DCS failed to comply with the order to provide Father with a parent aide and that while DCS may have been justified in not providing such a service due to his ongoing substance abuse, it should have requested relief from the court's order.  The court concluded, however, that because services are not required when the alleged ground for termination is abuse, DCS's failure to provide a parent aide did not mandate denial of the petition.

¶11       The court then outlined the medical expert testimony and found that "Father's testimony regarding his ongoing drug use is not credible and his implausible explanation of the possible causes of the Child's various injuries is unpersuasive."  The court further concluded that DCS had proven abuse, by clear and convincing evidence, as a ground for termination of Father's parental rights.  As to Mother, the court found that DCS failed to prove neglect by clear and convincing evidence, noting that Mother demonstrated "significant rehabilitation and sobriety."   In considering the child's best interests, the court noted that the child is doing well with his maternal grandparents.  The court then focused on Mother's sobriety and engagement in caring for A.H., concluding that termination of parental rights was not in the child's best interests but did not specifically state whether it was making that finding for both parents.

¶12       DCS filed both a notice of appeal and a motion for clarification, requesting in part that the juvenile court clarify its best interests findings as to Father.  DCS explained that while the court found a statutory ground for terminating Father's parental rights, it was unclear whether the court determined it was in the child's best interests to terminate Father's parental rights.  DCS also asserted that if the court intended to

deny the petition as to Father, its reasoning was not evident. In Father's response to the motion for clarification, he argued in part that DCS was improperly asking the superior court to "reweigh the evidence and change its ruling." This court stayed the appeal and revested jurisdiction with the juvenile court to allow that court to rule on the motion for clarification.

**¶13** The juvenile court concluded that the motion for clarification was "well-taken," and treated it as a motion for reconsideration. The court issued an amended order, granting DCS's petition to terminate Father's parental rights. The court reiterated that it did not find credible Father's explanations relating to the child's injuries or his positive drug tests. The court thus concluded that DCS had presented clear and convincing evidence of abuse. The court also found by a preponderance of the evidence that termination of Father's parental rights was in A.H.'s best interests. Father timely appealed, and we have jurisdiction under A.R.S. § 8-235(A).

## DISCUSSION

**¶14** To terminate parental rights, a court must find (1) by clear and convincing evidence that at least one statutory ground in A.R.S. § 8-533 has been proven, and (2) by a preponderance of the evidence that termination is in the child's best interests. *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 286, ¶ 15 (App. 2016). We will affirm an order terminating parental rights so long as reasonable evidence supports the order. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009). "The juvenile court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002).

### A. Reconsideration of Initial Ruling

**¶15** Father argues the juvenile court erred by treating DCS's motion for clarification as a motion for reconsideration. He contends he was denied due process because the motion failed to alert him the court might still terminate his parental rights. According to Father, if he had been given proper notice of the possibility of termination of his parental rights, "his attorney may have presented a more forceful defense to the motion."

**¶16** Father was not misled or prejudiced by DCS's motion. *See Hegel v. O'Malley Ins. Co., Agents & Brokers*, 117 Ariz. 411, 412 (1977) (explaining that a court may consider the substance of a motion, rather than the title, and address the motion accordingly). In his response, he argued

that DCS's motion was asking for relief that "reweighs and reconsiders the outcome." Given that the juvenile court had already determined DCS met its burden of showing Father abused the child, and because the court's order did not clearly state whether DCS met its burden of showing termination of Father's parental rights was in A.H.'s best interests, Father was reasonably informed that the court could still terminate his parental rights. On appeal, Father does not assert any specific defense he would have raised to counter DCS's motion for clarification. Nor does he contend the court lacked jurisdiction to reconsider its prior ruling, particularly after this court stayed the appeal and revested jurisdiction in the juvenile court so it could rule on DCS's motion. As such, Father was on notice that he was still in jeopardy of losing his parental rights over A.H. and the court did not violate his due process rights or otherwise err by treating the motion for clarification as a motion for reconsideration.

### B. Reunification Services

**¶17** As a general matter, DCS must provide reunification services and give the parent an opportunity to engage in the services, but it is not required to wait an indefinite period before requesting termination of parental rights. *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 37 (App. 1999); *Maricopa Cnty. Juv. Action No. JS-501568*, 177 Ariz. 571, 577 (App. 1994). Nor is DCS required to provide services that would be futile or to ensure parents participate in the services offered. *Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 235, ¶ 15 (App. 2011).

**¶18** Father argues that because the juvenile court found that DCS failed to provide him with reunification services, specifically a parent aide, his constitutional rights were violated. Father contends that if he had been provided such services, "the outcome may have been different for him," and DCS's decision to only provide Mother with services discriminated against him and gave her a greater opportunity for reunification. He therefore requests that we reverse the termination order and reinstate the family reunification case plan.

**¶19** The duty to make reasonable efforts to provide appropriate reunification services may arise through statute, *see* A.R.S. § 8-533(B)(8) and (11), or through case law based on the recognition of a parent's fundamental constitutional rights, *see Jessie D. v. Dep't of Child Safety*, ___ Ariz. ___, ___, ¶ 18, 495 P.3d 914, 922 (2021) ("Although § 8-533(B)(4) [(felony conviction ground)] does not impose an explicit duty on DCS to provide reunification services, the absence of a statutory duty does not obviate the state's obligation to provide these services."); *Mary Ellen C.*, 193 Ariz. at 191–92,

6

¶¶ 29–34 (holding that, before a severance based on mental illness under A.R.S. § 8-533(B)(3) may be granted, the State must demonstrate either that it has made a reasonable effort to preserve the family or that the parent is not amenable to any treatment program).

**¶20** DCS sought termination of Father's parental rights under A.R.S. § 8-533(B)(2), which provides that parental rights may be terminated if a "parent has neglected or wilfully abused a child." The statute contains no express language requiring DCS to make reasonable efforts to provide reunification services before termination, and no Arizona court has previously required such services when termination is sought under that subsection. *See, e.g., Bobby G. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 506, 510, ¶ 11 (App. 2008) (recognizing that "neither § 8-533 nor federal law requires that a parent be provided reunification services before the court may terminate the parent's rights on the ground of abandonment"). Father's trial counsel conceded this point, stating in his written closing argument that DCS "was under no statutory obligation to offer the parents services." Thus, on this record, DCS was not required to provide reunification services.

**¶21** Father contends that reunification services are constitutionally required, relying on the special concurrence in *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 152–56, ¶¶ 24–39 (2018) (Bolick, J., concurring). That analysis on the constitutionality of Arizona's statutes and rules regarding termination of parental rights concluded that the framework for terminating parental rights under § 8-533(B)(2), which lacks a rehabilitation component, fails to provide the "'fundamentally fair procedures' that the Constitution requires." *Id*. at 155, ¶ 38. Father's reliance on the special concurrence is misplaced because it does not represent Arizona law on this topic. Moreover, in this case Father waived this argument because there is no indication he raised it in the superior court. *See Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 175, ¶ 1 (App. 2014); *Romero v. Sw. Ambulance*, 211 Ariz. 200, 204, ¶ 7 (App. 2005) (holding that plaintiff waived constitutional challenges to a statute by failing to present those issues to the trial court).

**¶22** Along with showing no statutory or constitutional right to parent aide services, Father has not shown the juvenile court erred in concluding that DCS's failure to provide parent aide services did not affect the outcome of the case. In November 2020, the court ordered DCS to provide parent aide services for Father, among other services. When that had not occurred by March 2021, the court ordered DCS to expedite parent aide services for Father. Although DCS sought to justify its failure to

comply with the court's orders on Father's substance abuse after parent aide services were ordered, such substance abuse did not relieve DCS of its obligation to comply with the court's order. As a result, the court could have held DCS in contempt for its failure. Instead, the court squarely noted DCS's failure to comply with its order requiring parent aide services for Father and noted DCS should have sought relief from that obligation. It then concluded that because "such services are not required in abuse cases, DCS' failure to promptly provide certain services, including parent aide, does not dictate a denial of the termination petition."

¶23 Given our conclusion above that services were not required in this case, Father has shown no error in the juvenile court's addressing of DCS's failure to comply with its order. Father did not complete the substance abuse services provided to him and continued to abuse methamphetamine throughout the proceedings. The juvenile court expressed concern, noting that "Father's failure to testify credibly or adequately address his sobriety represents a severe risk of harm to the Child." Father does not challenge that finding, or the court's finding that he severely abused A.H. and likely did so while under the influence of drugs. Given the court's concerns about Father's unresolved substance abuse and how that would result in a risk of harm to A.H.—not merely Father's parenting skills—the juvenile court properly could conclude that providing him with parent aide services would have been futile.

### C. Best Interests

¶24 Father also challenges the juvenile court's best interests finding, asserting the court erred in failing to consider that A.H. would benefit from growing up with both parents and other family members. Father also argues the court should have chosen a "lesser alternative" to termination, such as supervised visitation.

¶25 Termination is in a child's best interests if either "(1) the child will benefit from severance; or (2) the child will be harmed if severance is denied." *Alma S.*, 245 Ariz. at 150, ¶ 13. "[W]hen a current placement meets the child's needs and the child's prospective adoption is otherwise legally possible and likely," a court may find termination of parental rights is in the child's best interests. *Id.* at 151, ¶ 14 (quotation and citation omitted). The court considers the "totality of the circumstances existing at the time of the severance." *Id.* at 150, ¶ 13.

¶26 Here, the juvenile court found that termination would benefit A.H., and he would be harmed if termination was denied. The court

explained he was doing well with his maternal grandparents, and they are well-suited to adopt him if Mother relapses. The court also found that Father had continued abusing methamphetamine after A.H. was hospitalized, despite acknowledging at trial that he "cannot safely parent while under the influence of drugs." The court found that "Father was likely under the influence" when he "severely abused" A.H. The court also noted that "Father's failure to testify credibly or adequately address his sobriety represents a severe risk of harm" to A.H. In addition, the court expressed concern that "[f]ailure to terminate Father's parental rights enables him to potentially have some access to" A.H. and that A.H. "is too young and vulnerable to protect himself." The court therefore concluded that termination serves the child's best interests, noting that it will provide predictability and stability because Father will not have legal access to A.H.

¶27        Given these uncontested findings, the juvenile court was not required to consider less restrictive alternatives to termination, and Father cites no authority to the contrary. Reasonable evidence supports the court's conclusion that termination of Father's parental rights served A.H.'s best interests.

## CONCLUSION

¶28        We affirm the juvenile court's order terminating Father's parental rights.

